Number 21-2563, Kosh Ishmael v. Attorney General, and we have Mr. Hooper and Mr. Eaton and Ms. Marshall. Mr. Hooper. Good morning. May it please the Court, my name is Benjamin Hooper. I'm a legal aid attorney for the Pennsylvania Immigration Resource Center, PERC, for the petitioner Ishmael Kosh, and I'll address the criminal issue. Now, you also dealt with the issue that your amicus friend will be speaking about as well, in which you advocate that the Regulation G should be the one that we apply. Most of our questions are going to relate to the regulatory interpretation and not so much to the aggravated felony. So I leave to you and your co-counsel how much you really wish to focus on aggravated felony and instead maybe both of you deal with G to the extent that there's not too much overlap. Very well. And if it's okay, Mr. Eaton is primarily prepared to address all the issues regarding the 240 hearing issue, and I'll speak to it as well. If I could just maybe begin, though, just to address briefly the criminal issue. The petitioner was tortured in the Civil War in Liberia, so he was adjudicated an asylee. And as we will address in the second argument section, what should have happened is he should have been afforded a 240 hearing where the judge could have balanced the issues of the circumstance of the crime against the equities from his more than 20 years here. If you're under the Visa Waiver Program and the waiver that exists in connection with that, you can't ask for an adjustment of status. Is that correct? If you're under F as opposed to G as an effect? Well, not so much if you're in F as the way your case is reopened, but sure, if you had entered the United States seeking a tourist visa through Visa Waiver, then that's right. The only thing you can defend a removal decision against is an asylum, which is what happened here. Got it. Yes. And it was error of the court, as we say in the second section, to place him back in that program intended for tourists under Visa Waiver. What happened, though, first is the government, in perhaps their rush to deport Mr. Kosh, they failed to put the proper charging document for the aggravated felony into the record. And that's dispositive. And if I could just briefly address as well, the BIA also committed a legal error in not distinguishing between the loss from his criminal conduct tethered to what he was convicted of from unconvicted conduct. And third, on this record that we have, there is no statement of losses. Just the restitution amount on the aggravated felony is well above, what, $239,000? Yes, it is, Your Honor. That's correct. So that's well above $10,000. And that can come in, for example, seeing the 2020-2012 case that the government cited in their papers. But that case makes clear that for sentencing purposes, that can look at not convicted conduct, other behavior. And the reason we have the tethering requirement is in the aggravated felony definition. The loss has to be for things he did. And in here, it was just the conspiracy crime. Right. Doesn't the conspiracy crime bring in the whole fraud scheme? So that's the government's position. But the problem in just relying on the sentencing documents, the pre-sentencing report, is we haven't parsed out what parts of the conspiracy he did and what he didn't do. And here, he was acquitted. But once he joins the conspiracy, he's responsible for all of it, right? Maybe in the criminal matter and for criminal liability purposes, yes, but not for immigration. I mean, what you're trying to do is say, okay, he's responsible for only a portion, but wasn't he a major player in this conspiracy? And without the charging document, we don't have the analytical starting point. You know, that anchor that fleshes out what he did, what behavior in the conspiracy he did, and what he didn't do. And if I just may, really briefly on the aggravated felony definition for conspiracy, I think the RAD case made this point very clearly, that when we combine those two definition sections, U is conspiracy, 8U at C, 1101A, 43U, with fraud with a $10,000 loss under M1, if you're going to combine the conspiracy, then the finding has to be what the intent of the conspiracy was. And we don't have those facts. The BIA certainly didn't make them. And so, like in the RAD case, what's appropriate here is a remand on that issue. What additional evidence would be needed by the government to show a loss amount greater than $10,000 in your view? Correct findings based on stuff he did. So hypothetically, for example, say there was a plan to commit tax fraud involving, say, a tax credit for $2,000 that is fraudulent, right? If that happened, if that was in the criminal judgment and in the charging document, and say it happened five times, so we get to $10,000, and there was the plan to do that, that kind of evidence, that kind of finding would be sufficient. Where in the record can we look to find evidence that a reasonable adjudicator would be compelled to arrive at a contrary conclusion to what the adjudicator here found in terms of loss amount? If we look at the pre-sentencing report, where it says what it relies on, it says it relies on evidence that's presented at trial and other material, things that weren't even charged of, investigation from the Internal Revenue Service. So on that basis, that's not tethered, that can't be tethered to the conduct of conviction. But I guess where the government's estimate in the PSR that Mr. Close did not object to for the whole conspiracy was $2.5 million, and with such a deferential standard to the immigration judge, how can we say that a reasonable adjudicator would have been compelled to find the loss amount was under $10,000? Because the loss amounts simply aren't stated anywhere in the criminal documents we have. Those are sums that came in later at sentencing. And if we may speak to the Derangeau case that we submitted with the 28J letter, that's a perfect example. It seems like it's exactly what we have here. It said the charts show losses, excuse me, the charts that speak to tax returns that were allegedly fraudulent, but there are no losses. And that's precisely what we have in this record. We don't have any statements of losses. I want to come back to the distinction you were making between criminal cases and immigration cases. In Doe and in, I don't know how to pronounce it, Chow Feng Ku from 2019, we said that in applying this circumstance-specific approach, we look to the entire scheme in which the defendant aided and abetted to determine the loss amount. Why isn't that essentially the same as the one joining the conspiracy is in for a penny and for a pound? Yes, because Doe and Ku were not situations where the defendant in those cases were acquitted on some charges first. And second, they're not conspiracy cases. They were just litigated under the predicate crime, the M1 definition. So there we don't need to have findings of what the intent was necessarily. But under the RAD case, that's what's required here. Anything further? Unless there are other questions. Let's hear from your amicus. Thank you very much. Good morning, Your Honors. And may it please the Court, my name is Jonah Eaton, and I am representing amicus curiae in this matter, the American Immigration Lawyers Association and Southern Poverty Law Center. In the Refugee Act, Congress created a mechanism by which the agency can recognize a refugee in this country and grant them asylum status. Congress has also barred the removal of asylees unless their status is first terminated in removal proceedings. So this case involves a procedure by which a refugee who faces persecution in their home country can be deported, possibly putting them back into danger. Critically, Mr. Kosh has been incorrectly denied a proceeding. The issues that we're having to some extent relate to which subsection of the regulation should apply here. And you're suggesting, I think, that it should be F. And in fact, you say it's the sole means of terminating an immigration judge's previous grant of asylum. But the question, we can get into nuance with that. Why are you saying that G is out of play? So, Your Honor, if I may, I'd first like to take a short step back and just look at the statutory language, of course. Under which statute is pretty silent, isn't it? I don't think that's correct, Your Honor. So 8 U.S.C. 1158 C 3 explicitly says the aliens removal or return shall be directed by the attorney general in accordance with Sections 1229 A. That's the 240 proceeding. So that is the statutory language governing termination of asylum status. And then, you know, you have that sort of long menu. What is it? Sections subsections A through G sort of specifying different scenarios under which asylum may be terminated. The first set first set, excuse me, being directed towards the Department of Homeland Security. So if the initial posture of the case was before an asylum officer, the matter could be directed back to the asylum office for adjudication of the termination question. If it was decided by an immigration judge, then it would be directed back to the immigration judge. We are we also argue, though, that, you know, under any of these provisions, we still need to be back in the 240 proceedings, you know, But also under F, you know, F is broader, I believe, than what the government argues in that, you know, it's the language here is an immigration judge, a board of immigration appeals may reopen a case pursuant to Sections 3.23 of this chapter, excuse me, for the purpose of terminating asylum. So the language is suggesting we're reopening a question. We're reopening a matter. We're reexamining the determination of if this person is still an asylee. And, you know, in the statute, we've got sort of a short checklist of things that the agency needs to determine if asylum status is going to be terminated or not. But none of that precludes, you know, access to a full 240 proceeding. And we think that's why there's a specific reference in subsection G to a Section 240 proceeding. Because, you know, that's just the underlying assumption of all these regulations is that we need to be back in front of an immigration judge because there are independent statutory rights, you know, for an asylee to apply for adjustment of status under the statute, for them to have access to the 209C waiver, which we describe as one of the most generous in immigration law, which I think is probably not controversial. But the word reopen in subsection F has to refer back to something, something that was previously open. And in Mr. Koch's case, the only thing that proceeding that had been open was asylum only. Isn't that right? That's exactly the question I have, too. Yeah, and it's an excellent question, Your Honors. So the previous proceeding, so because he entered in the posture sort of under the provisions of 217, he was directed towards asylum only proceedings before the immigration judge. Or at least a proceeding where he could only, asylum, withholding and CAT were the only things on the table in that first instance. But again, I think that, you know, the, you know, I think that the regulatory language is broader in that the core concern here is the question of whether or not he remains an asylee. And because the statutory language clearly directs us towards a 240 proceeding, you know, that needs to guide our interpretation of how we read the implementing regulations under that statute. I mean, if I could even, you know, sort of maybe speak a little more sort of broadly about some of these provisions. So the... So let's just see if I understand your argument. You're saying that if F applies, you still have to look back at the statute 1158, 1158 directs you to 1229A. Correct, Your Honor. And I think that sort of makes perfect sense in the context of, you know, the way these statutes are operating. So Section 217, again, this is a, you know, the visa waiver program is designed for tourists. That's explicit in the language of the statute. And it's, you know, part of a set of rules addressed towards people who sort of first present themselves to the United States government, to the immigration authorities, with very little prescreening. And so as an administrative matter, they are directed into relatively quick, you know, relatively straightforward proceedings, where really the only things that are at issue are forms of humanitarian protection, because we signed international treaties saying that we would protect refugees. Whereas on the other side, you know, in the Refugee Act, you know, Congress created, you know, not only the right to apply for asylum as soon as you step foot within our borders, but also, you know, with that right is the right to adjustment of status, the right to access to the waiver, the right to someday naturalize as a United States citizen. And again, that's reflecting sort of, you know, provisions from the international law obligations as recognized by the Supreme Court and Stevick and Cardozo-Fonseca. And so, you know, the idea that, you know, this sort of limited procedural posture of these cases under the visa waiver program, you know, needs to stay with an applicant sort of throughout their interactions with the immigration authorities. Just doesn't make sense. I'm not familiar with that case, Your Honor. I apologize. But if you'd like to order me to do some supplemental briefing on it, I would be happy to oblige. 41F4237. Thank you, Your Honor. Skempe basically considered whether the waiver applied to non-citizens upon initial entry when they use fake passports. This is a case where the person agreed that he had used a fake passport, claiming he was from Portugal when indeed he was from Liberia. Yes, that's correct, Your Honor. So actually, we're not at all questioning the deficiencies in that immigration proceeding 20 years ago for the immigration court in Dallas. You know, he, I mean, you know, there might have been some sort of factual issues. He said in his initial interview 20 years ago, again, that he didn't understand the provisions of the waiver. But we're not saying, you know, we think the time is long past to question or discuss whether or not that was a properly executed waiver or not. He was correctly placed in asylum-only proceedings under the terms of the statute. We don't quibble with that. And he was granted asylum. And once he was granted asylum, that also fundamentally changes his relationship under the immigration law. He has a new status as an asylee. I actually, I think you're perhaps referring to the Ninth Circuit case in Beare v. Barr. I think that, well, there's two prefatory points I'd like to make, if I may. The first being is that, you know, I think that this case is importantly distinguishable from Beare v. Barr, partly just because stowaways are different. I can speak to that in a moment. But I can also speak to the fact that in Beare v. Barr briefing that he traveled abroad on a U.S. government-issued travel document and was then readmitted into the United States. So he was actually admitted into asylum status. That's what Customs and Border Protection calls it. They maintain a list of statuses on their website. And asylum status is one of them. It's AS6. And so, you know, he actually has an admission in asylum status, which was not the case in Beare v. Barr. And also that sort of implicates the subsection F versus subsection G question. Because, of course, if he has an admission in another status, which we're saying it's in the record, it's a matter of obvious and clear fact, then G would not be implicated. It would be more complicated if he had not made that trip and been readmitted. But once you have an admission into a status, you're no longer an applicant for admission, which is what implicates subsection G. Obviously, the direct reference to subsection G would have been more helpful for us. And I do also think that that's a... Is what you're saying is if he's under the visa waiver program, does the waiver extend to subsequent reentries? Yes, that's exactly the sort of issue we're getting at. And so, again, if I can sort of, you know, go from the general to the more specific, you know, generally speaking, you know, the purpose and intent of these rules is a quick, relatively easy administrative proceeding. We make a decision on asylum, yes or no, and then we quickly send the person back. I understand the argument, but is there any authority for your position? So I think it stems from just the language of the statute, Your Honor. You know, if you look at... So I get the statutory argument, but my question was whether you have any authorities to back up your position. Well, let me say this, Your Honor, if I may, and I do want to acknowledge that my light is red. Thank you, Your Honors. So I think, you know, the argument I would make on that question, and this also, I think, implicates the point you just made about Bear v. Barr, is that there's also no authority for the idea that visa waiver program involved person, as Mr. Bear was, is a status under immigration law. It isn't. You know, we have immigrant statuses in immigration law. We have non-immigrant statuses. There are sort of discrete lists of these things in the immigration law. If he had been admitted under the visa waiver program, if he had come with a real Portuguese passport, if he had actually been a citizen of Portugal, that is an immigration status. You're admitted and it comes with certain rules. You have to leave within 90 days. You are still bound by these very narrow sort of asylum-only proceedings if you end up, you know, if they end up trying to deport you before the 90 days are up or even afterwards. So those rules still apply. But that is a status. But simply being processed under the provisions of the visa waiver program, that's not an immigration status. It's a set of procedural rules that attach at your first interaction with the immigration authorities. But it does have consequences by virtue of the waiver that you sign. Yes, Your Honor, but we don't believe that that waiver sort of lasts in perpetuity even as your status changes under the Immigration Act. And I don't think that the government has any, you know, authorities for that contention either. Is it your view that the waiver still applies to individuals who enter under the visa waiver program, are granted asylum and do not opt to travel with  Yes. I'm sorry. I want to make sure I understand that. Can you repeat that one more time? He didn't leave and he just never traveled and didn't have that subsequent entry. Would the visa waiver program, would the no contest provision still apply? No, Your Honor, because it's the grant of asylum that's actually critical. Now I think like we can win sort of by, you know, I offer that the travel and the clear opportunity to maybe write an opinion in our favor that is a further step removed from the Baird v. Barr decision. You know, it's an important distinguishing characteristic. But our fundamental point is that when you are, you know, you present yourself under the provisions of the visa waiver program as he did with the false passport, again, setting aside any confusion he might have had at the time, he's correctly processed in an asylum only proceeding and he wins. He's granted asylum. So that's exactly how the process is supposed to work. But once he has asylum, you know, he, you know, his status as per the immigration laws have fundamentally shifted. And so, you know, that's when we're back to the statutory language. You know, they were trying to reopen a, you know, the question of whether or not he's still an asylee, but that doesn't rob him of his right to apply for adjustment of status before an immigration judge in conjunction with the 209C waiver. And that is described as a right, you know, by the government in, you know, in several places. The USCIS policy manual specifically calls it, you know, basically if USCIS denies an asylee adjustment of status, you know, this does not prejudice their right to renew that application before an immigration judge. Let me circle back at the end to where we were at the beginning. You suggest that the subsection of the regulation that should apply to asylum is F, but whether it's F or G, it doesn't make any difference because you're saying you go back to 1158. What are you looking at at 1158? 1158C3 or C2? C3, Your Honor, so that's where we... That takes you to 229A. Yes, Your Honor. But C2 talks about termination of asylum, and that does not direct you to a plenary proceeding under 1229A. It's silent. Yes, Your Honor. I believe that what C2 is directed toward, because then you have subsections A through E, and that's telling the agency, you know, what are the grounds on which we can terminate asylum. And so it's talking about, you're no longer a refugee. I mean, one reason to terminate asylum is just your country is safe now, and you can go back and everything's okay. So that's a fairly straightforward one. Safe third country agreements, you get, you know, citizenship in some third country and you can go live there safely. And these are all, you know, core concerns of immigration, of asylum law generally. These are all things that the agencies think about when they're first considering asylum application. This is a very familiar list for asylum practitioners. So subsection 2 is telling the agencies, you know, what are the grounds on which we can terminate asylum. It's not, you know, an open-ended sort of inquiry. It's cabined to these particular issues. And then subsection 3 says how we're going to do the termination. And that's where, you know, we have this language in accordance with section 1229A. And so that's where we get the authority that these need to be back in front of 240 proceedings. Thank you. Any further questions? Thank you very much, Your Honors.  May it please the Court. I'm Lindsay Marshall on behalf of the Attorney General. Mr. Koch seeks review of the Board's decision determining that his conviction of conspiracy to defraud the United States was an aggravated felony that terminated his asylum grant, and that his asylum grant could be terminated in the context of his reopened asylum-only proceedings. The Court should deny the petition for review because the Board is right on both counts. I'll start with the asylum termination issue because that's the stickier wicket in this case. Here, neither the statute nor the regulations preclude the reopening of an asylum-only case to terminate asylum. The statute itself refers us back to 1229A or 1231 to affect the removal of someone whose asylum status has been terminated. 1231A isn't very helpful here. It's just about how removal has effectuated itself. 1231 is really withholding removal, isn't it, normally? I think so. But what we're looking at here is 1229A, which itself, although it's the statute that speaks how plenary proceedings ought to go, it also says that plenary proceedings are the exclusive venue unless otherwise specified in this chapter. This chapter also specifies that visa waiver protection entrants are subject to proceedings only to evaluate their eligibility status. This is a narrower scope than plenary proceedings. Unless otherwise specified in this chapter, but unless the government is referring to as a regulation, right? Well, the 1229A itself says unless otherwise specified in this chapter. And earlier in this chapter is 1187, which is the provision speaking about asylum-only proceedings. But what the statute doesn't tell us is how termination ought to be done. So to fill that gap, the agency promulgated regulations, as it was entitled to do, describing how this happens. And it lays out three different pathways. The first and the third, E and G, they direct DHS to put someone into 1229A or plenary removal proceedings in certain circumstances. But that second one, F, it authorizes the agency to reopen a case, any case, pursuant to 3.2 or 3.23 for the purpose of terminating a grant of asylum. Unlike the other provisions, it doesn't specify... The problem you end up with is it's like a law school exam in immigration on statutory or regulatory interpretation of this case. The statute appears, one could argue, is silent on how procedurally to terminate asylum. And the question is, what's the governing regulation? Now, you rely on F, which says that IJ may reopen. But G says that the Department of Homeland Security shall initiate plenary proceedings if the non-citizen is an applicant for admission, previously granted asylum. What is applicant for admission defined as? An applicant for admission is someone who just hasn't been admitted. So it could be an arriving person, which is what G says, or it could be somebody who's already got asylum and is seeking it again. That's true. But because this regulation starts out with this phrase, this caption about termination of asylum for arriving aliens, we think it can't be read so broadly as to include every applicant for admission. It seems to be aimed at a narrower subset, applicants for admission who are also arriving aliens. Don't we normally disregard those headings and go right to the text? I think we can take it here as something that's helping us distinguish between these three separate procedures. So without the heading, then the definition of applicant for admission would be the statutory definition under 1225A, right? So arriving aliens or anyone else who hasn't been admitted. So considering that would introduce ambiguity. Do you agree with that? I would agree. If the court does find that it is ambiguous, it can remand for the agency to do that statutory interpretation or regulatory interpretation in the first instance. But I don't think it necessarily is ambiguous here. I think we have enough to show us what the agency was getting at. It says if the service determines that an applicant for admission, which you agree can be either those arriving or somebody just applying, who had previously been granted asylum in the United States, falls within conditions set forth in another regulatory provision and is inadmissible, they shall issue a notice of intent to terminate and initiate removal proceedings. In other words, plenary proceedings. That's still the issue here. And what they're trying to do, obviously, is if you get plenary proceedings, you can eventually ask for an adjustment of status. And I realize that's discretionary, but at least they have that option because the person has three children here in the States. I think that if we read it that broadly, any person who has ever been given asylum, which is the only people subject to asylum termination, would all fall under G. Well, not necessarily with somebody under the Visa Waiver Program. Well, if they're still granted asylum, they're technically not admitted, so under that reading they would be an applicant for admission. Do you agree that if Mr. Koch left and reentered before initiation of the termination proceedings, then subsection G would apply because he was an arriving alien? And upon entry, DHS decided that he was not admissible? I think that if this had happened at the border and he was truly at that point an arriving alien, then G might apply. If he had previously been granted asylum. And at the time he says that he came back, at that point he had been granted asylum. If DHS had stopped him at the border and made this termination, I think we would be in G territory. But why should someone have more rights, like the right to a full plenary hearing just by virtue of having traveled, opted to travel and come back? Well, I'm not entirely sure because we don't have a clear indication. But I think it's a precarious position, thinking that they could come back into the country and then not being able to. I want to redirect towards the purpose of having three different pathways. If my colleague is correct in that all roads lead to 240 proceedings, then why have three different provisions here? If all roads lead to 240, then why would the agency have set three pathways? Why would they have only mentioned removal proceedings, plenary removal proceedings, in two of those three different pathways? And if any applicant for admission, which is someone who has been granted asylum, i.e. hasn't been admitted and hasn't terminated, they would all fall under G. What would be the purpose of the other two provisions? Go back before that. The other two provisions are the possibility of asylum. So in effect, you're giving up an application for adjustment of status. But if he left the country and reentered in 2005, how is he still subject to the visa waiver program waiver that he signed in 2001? Isn't that waiver limited to the period of entry following when the waiver was made? Because under our reading of the statute, asylum is just a benefit that overlays your previous status without supplanting it. I think we can see this in two ways. So if he maintains that visa waiver program status all along, doesn't it make the potential ambiguity in the regulation moot because he's still subject to the waiver? He's subject to the waiver until he adjusts his status. But he can't adjust his status unless he's outside of the visa waiver program waiver. Well, being granted asylum gives you an extra right to adjust your status. That's clear in the asylum statutes. I don't think he's prevented from adjusting his status simply because he entered as a VWP once he gets that grant of asylum. The problem is, did he have the right to apply for it once that asylum was taken away? How does it promote the purpose of the VWP to extend the no-contest provision indefinitely for someone who has the potentially indefinite privilege of staying in the country as an asylee? Well, I think that when you become an asylee, you have the ability to adjust your status within a year. So the goal here is for them to take advantage of that and regularize that status. And by adjusting status, by changing from the asylum status to the LPR, the lawful permanent resident status, that change would truncate the VWP waiver. But Mr. Kosh here, despite having 14 years to apply to adjust his status, he didn't until he already had this conviction hanging over his head. And his application for adjustment of status was denied. Something in the briefs mentions that he applied for adjustment of status in 2007 and it wasn't processed until some nine years later. Do you know the specifics of that? No, I don't. I believed that he had applied for adjustment in between his trial and his actual conviction, which would have been in 2016. Mr. Kosh's counsel may have answered that. Okay. I'd also just like to discuss why it makes sense for asylum to be a benefit that overlays an existing statute instead of supplanting it. I think beyond just the statutory text that the government discussed in our brief, it makes sense given the context of the statute and what asylum is. Asylum is a barrier from removal. Unlike most visa-based statuses where it's a hook for you to come to the United States, asylum just keeps you from being removed. And we know that asylum is right off the bat different from those statuses, because unlike them, they hinge on being admitted into that status at the border. Asylum, we know, is a grant that isn't an admission. TPS, or temporary protected status, is also a grant from the government for people from countries undergoing some kind of crisis. So are you in effect saying that he, this particular person, is not an applicant for admission? Well, while he had asylum, he's technically an applicant for admission, because he hasn't been admitted. But what I am trying to draw a contrast between, or trying to provide an explanation of, is why it makes sense for asylum to be a benefit that overlays an existing statute. And why it makes sense for asylum to be something that simply overlays his VWP status without truncating it. And it's not the only status that does that. Temporary protected status is the same way. It functions similarly as the barrier for removal. You can hold a different status at the same time that you have TPS, and when TPS is truncated, when the program is either ended by the government or your particular TPS status isn't renewed, all you have left is the same barrier. So what I understand you're saying is that he is technically, by virtue of being granted asylum in 2001, an applicant for admission. Yes, but not in the writing area. So that explains, because on page 39 of your, I think, your answer in brief to the government, you said that Kasha asserts he is technically an applicant for admission, because he was granted asylum. He is correct that a grant of asylum is itself, is not itself an admission, so he's an applicant for admission. Yes, he is an applicant for admission. So doesn't that then come directly within the words of G? We think that G, though, is more narrowly focused at applicants for admission who are also arriving aliens. But the text doesn't read that way. Well, we have, again, we have those three different pathways. If an applicant for admission is just someone who's been granted asylum, then all asylees would fall under G. Why does the ambiguity, potential ambiguity in F and G matter if he's still a VWP entrant? In terms of what subsection he would fall under? I'm not sure I fully understand the question, so let me try answering it and tell me if I... Yeah, really, that's a key point in how you come out on this. He comes in the country, he signs something relating to the visa waiver program, then he says, okay, I lied. I said I'm from Portuguese citizenship, I don't, I'm from Liberia. He then still gets asylum, does he not, in 2001? So does that waiver still apply for the visa waiver program when he subsequently gets asylum? You tell me. Yes, because the asylum didn't truncate his VWP status, it just overlaid it. And when, if he had adjusted status, it would have, that adjustment, that actual change of status, would have supplanted all of his previous statuses. Because we know that because the board has told us that. But if he left in 2005 and came back, if there's evidence that he actually came back, isn't a new entry in 2005 essentially a new contract with the government? I don't think so, because again, that asylum just is, would be the basis, right, for his reentry. And if that asylum is just a benefit that overlays that VWP status that has never been truncated, I don't see how terminating that overlaying asylum status still wouldn't affect the perpetuity of his VWP status. Is it fair to summarize your position as once a VWP entrant, always a VWP entrant, unless you've changed your status? Yes. Which is not an impossible feat. Let me ask this question on asylum. If a person gets asylum in this country and then wants to leave the country, you have to ask permission, supposedly, in order to keep your asylum status? Yes. Did he ask permission to leave in 2005? I assume not. I believe he did. It looks like there's a really fuzzy copy of a refugee travel document in the record. We have evidence of his leaving. We just don't have evidence, although he's back, we just don't have any evidence of his... ...anything extra than he already had, which was the asylum overlaying his VWP status. I see my time is out, but could I give a short conclusion? Sure. I just want to speak quickly to the overall justice of the situation here. He was subject to the VWP restrictions because he asked to be. He chose to be when he applied, fraudulently, to be a VWP entrant. And then his asylum was terminated, again, because of his own actions, as they relate to his conviction. That placed him back on the VWP path that he already chose. His ultimate goal here is to get his adjustment of status re-adjudicated, but he had 14 years... That still seems like an uphill fight. Yeah, he had 14 years to do it. It's already been denied, and it's unclear if he's eligible, given the fact that he'll need a multitude of waivers. He wasn't being railroaded here. He got all the process that he agreed to and was due. The board was not wrong to deny... In effect, what he's asking for is the opportunity to throw himself on the mercy of the court, note that he has three children, etc., and it will be discretionary, the decision. And probably, if one were to bet, it's not going to be...you would probably bet against him. Getting that discretion. If I was a betting woman, I probably wouldn't place my bet on his odds of getting it. He's asking for a lot here, and the board wasn't wrong to turn him down. If there are no further questions... Thank you. Thank you very much. Hello again, Your Honors. If I can just begin with the last bit of discussion from my friend. So first of all, I think at some point in their briefing they refer to it that Mr. Kosh is asking for a second bite at the apple. We are asking for a second bite at the apple, because that is his right. He's asking for something otherwise he cannot get if the visa waiver still applies to him. If the court is persuaded that the visa waiver program exists in perpetuity, then that is the case. But I want to push back on that rather strongly. But I did just want to briefly cite 8 CFR 1209.2 F. So this is discussing when the service, as is the case here, has denied Section 209 adjustment of status. You know, it's titled decision, the applicant shall be notified of the decision. And if the applicant is denied, the reasons for the denial, there's no appeal of that decision. But such denial will be without prejudice to the alien's right to renew the application in proceedings under Part 240 of this chapter. So again, the asylum statute, you know, creates a statutory right for asylees, again, in consideration of, you know, sort of the humanitarian considerations that undergird the asylum statute, it allows them the right to apply to the service and then also to renew that application to the immigration judge. If the waiver, to assert that the waiver under the visa waiver program is not in perpetuity, what cuts the chain? So again, Your Honor, our argument is that the first place where the, I think the chain has been cut twice. So first was when he was granted asylum. And again, that, you know, I think is within the context of how these programs operate. You know, you were saying to the immigration authorities, you were saying I want to stay as a tourist for 90 days, yes or no. If you are admitted, you know, then you are allowed to stay for the 90 days, then you have to leave. And while you're under the auspices of that program, you know, you only have recourse to this, you know, limited and narrow proceeding. Just hold that thought. That's one of two cutting the chain that you're saying. Yes. But if your grant of asylum is then terminated, then what? So if your grant of asylum is terminated, so first of all, there's language that termination decisions can be, you know, considered concurrently with removal proceedings, right? And in the adjustment context, the BIA has clearly said that both termination and adjustment of status are discretionary. Neither of them are mandatory. Termination is not mandatory. What I mean is what happens to your former VWP entrance status, which went away when you're granted asylum? When your asylum is then terminated, does it spring back? It doesn't, because you're not presenting yourself. The visa waiver program is all about you're an applicant for admission. I'm a German tourist. I want to go to Disneyland. Here's my German passport. And it is a consideration, are we going to admit you or not, you know, under these auspices. In Mr. Kosh's case, because that's what I should point out, there's, you know, many, many, many refugees commit some sort of document fraud at some point. I mean, in many cases that is, and I mostly represent asylum seekers, it is almost impossible for an asylum seeker to make it from some war zone to the United States without telling some fib along the way to some government official, whether it's our government or another country. I am interrupted at your argument. Do you want to get to the second way that it was cut? So the second way it was cut, Your Honors, is if, you know, this, you know, you accept that this trip and this return, you know, with a refugee travel document, essentially resets the status. Because again, he then has a separate admission, an admission that has nothing to do with requesting admission under the visa waiver program. The way the visa waiver program operates is I want to, I am requesting entry into the United States. I want permission to come in, yes or no. If the answer is no, then my only recourse is asylum proceedings. Do you get asylum, yes or no? In his case, yes. So then we're done with the program at that point. I'd also point out just procedurally at the time, in the administrative record, you can see the I-94-W that he actually had to, you know, the waiver he had to execute it. Those are executed on, at least at that point. This has now been computerized. We were still on using paper forms back in the early 2000s. That was executed on every trip. So every time someone was availing themselves of a visa waiver program entry in the early 2000s, they were re-executing this waiver every time, re-signing this card and requesting admission again. Can I step you on that? So when he traveled and came back in 2005, what, if anything, did he have to sign? So when he traveled, he would have filed a, again, as an asylum practitioner, I've done this hundreds of times, he would have applied for a refugee travel document. And again, right of travel is, it's in the Refugee Convention and it's in our statutes. It's something we're supposed to afford refugees. So he would have applied for a refugee travel document. You get a document back from Homeland Security that looks very much like a U.S. passport. It has pages for visas. And you then show that to the airline. Does it refer in any way to his previous visa waiver program entry? No. It is entirely authorized by the asylum statute. It lives in the asylum statute. That's where the refugee travel document operates. It has nothing to do with the visa waiver program. And so, you know, that was a, again, sort of requesting permission in advance, you know, to take this trip and then to come back. And the CBP manual, you know, from, there's a 2005 CBP manual that was obtained through a FOIA request that AILA has on file. And it pretty explicitly says, if someone shows up at the airport, they've got the refugee travel document, you know, process them for admission, apply grounds of inadmissibility, and if they're admissible, you admit them in asylum status. And so that's... It sounds like your view is that the waiver applied for the initial entry through VWP, and then it was terminated with the grant of asylum status. And then so it never needed to be renewed at the reentry post-travel. Yes, because he was, again, he was denied admission under the visa waiver program, right? So he's not, again, I have to resist this use of the term visa waiver program entrant. He was never allowed entry under the visa waiver program. He was not allowed admission, but he was allowed entry, right? Well, but it was, it was so that he could exercise his right to apply for asylum. You know, that's, that's what the entry was. And there are other postures in which, you know, he would have ended up in, you know, we have an expedited removal proceeding under Section, under 8 U.S.C. 1225, which applies more broadly to arriving aliens. You know, which is also sort of an expedited process. You know, if he had accidentally left that Portuguese passport on the airplane and then presented himself to CBP with no documentation whatsoever, he still has a right under Section 208 to apply for asylum, because he's presenting himself to a CBP officer and requesting asylum. And so then he just would have been processed under, you know, presumably under the expedited removal proceeding. And I think that also, though, sheds a little bit of light. If I can answer, you know, the government asked the question, you know, why only plenary proceedings in E and G? I think my answer is because it's just fairly obvious that all of these provisions need to steer us back to 240 proceedings. And so in Section E, you're dealing with, it's talking about termination by the agency. And so then what happens? And so they're saying, just to be clear, you need to file an NTA and put him back in front of an immigration judge and the ICE and the IJ will decide what happens next. In G, termination of asylum, you know, so that's the applicant for admission provision, which also then refers to 240 proceedings. That's because, you know, an asylee who's an applicant for admission is probably relatively unlikely, but you can imagine an asylee who presents at a U.S. airport, but their refugee travel document has expired, for example. They could be processed as an applicant for admission as an arriving alien. And it's making clear, you know, don't apply expedited removal, put them in 240 proceedings, because that's a more ambiguous situation when they show up at an airport and are presenting to a CBP officer. So, you know, again, and especially in the context of the clear statutory language in accordance with 1229A. I also want to make one other point, if I may, regarding, you know, some really kind of strange results if we, you know, if the court, you know, were to fully accept the governance, my friend's position on all of this. So the first one is, you know, from a very structural position, arriving aliens and applicants for admission are in a more precarious place than people who are in-country or who have been admitted. And so, Judge Ambrose, I think this reflects a question you asked. Under the government's interpretation, this would flip that on its head, where the arriving aliens are in a more precarious place than people who are in-country or who have been admitted. So you have an arriving alien who it is much easier for the government to just bounce someone back when they're an arriving alien or an applicant for admission. You're applying grounds of inadmissibility, which are much broader than grounds of deportability. And so, you know, the government's interpretation flips that relationship on its head. And suddenly arriving aliens and applicants for admission have greater rights than people subject to subsection F. So that just, you know, doesn't make sense from sort of a big picture structural standpoint. Very good. Thank you very much. Thank you very much. Very well presented arguments. I would ask if a transcript could be prepared of this oral argument and if the government would be willing to pick that up. The cost for that. Let's go with the clerk's office afterwards and just make the request and they'll take care of it. Thank you. Thank you very much.